ELI LILLY AND COMPANY,

      Plaintiff,

                             CASE NO.: 1:25-cv-00664-TWP-TAB

vs.

PREMIER WEIGHT LOSS OF INDIANA,
LLC D/B/A PREMIER WEIGHT LOSS, and
PREMIER WEIGHT LOSS
MANAGEMENT, LLC,

      Defendants.

## DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT FOR TRADEMARK INFRINGEMENT AND FALSE ADVERTISING

Defendants Premier Weight Loss of Indiana, LLC d/b/a Premier Weight Loss and Premier Weight Loss Management, LLC (collectively, "PWL"), by counsel, for their Answer to Plaintiff *Eli Lilly and Company's Complaint for Trademark Infringement and False Advertising*, state the following:

## INTRODUCTION

1.     Defendants Premier Weight Loss of Indiana, LLC d/b/a Premier Weight Loss and Premier Weight Loss Management, LLC (collectively, "Defendants") have designed their website, blog, and other advertising materials to communicate that they sell Plaintiff Eli Lilly and Company's ("Lilly") medicines, sold under the brand names MOUNJARO® and ZEPBOUND® (the "Lilly Marks"). PWL promotes its business in this fashion to convince customers that the drugs it sells are unaltered, FDA-approved Lilly medicines and therefore come with all the safety and effectiveness assurances that accompany the regulatory approval process and Lilly's 150-year reputation as a pharmaceutical manufacturer.

**ANSWER:** Defendants' website, blog and other advertising materials speak for themselves. Defendants admit they have referenced the MOUNJARO® and ZEPBOUND® brand names in marketing Defendants' weight loss services. Defendants deny the remaining allegations in Paragraph 1 of the Complaint.

2. By cloaking itself in the goodwill and assurances associated with Lilly's medicines, PWL explicitly contrasts the products it offers from the knock-off, untested, and unapproved products offered by other compounding pharmacies and med spas. For example, PWL warns consumers that "[i]t is not a guarantee that compounded … medications will be as safe and effective as the name brand … medications!" It then advertises that it "only" sells "name brand, FDA approved weight loss injections!," just the "authentic," "real stuff," and "FDA approved, brand name GLP-1 injections like Mounjaro [and] Zepbound."

**ANSWER:** Defendants' website, blog and other advertising materials speak for themselves. Defendants admit they differentiate their services from those of compounding pharmacies or med spas whose medicines contain compounded substitutes. Defendants deny the remaining allegations in Paragraph 2 of the Complaint.

3. That is a lie. PWL is not selling "authentic," "FDA approved" "MOUNJARO®" or "ZEPBOUND®." Those approved Lilly medicines are factory-sealed, sterile single-dose "auto-injector pen" or sterile single-dose vials. That is not what PWL offers. Instead, it sells its patients altered, unsterile products that have been unsealed, repackaged, and re-dosed to stretch Lilly's single-use auto-injector pens into five lower-dose injections.

**ANSWER:** Defendants deny the allegations in Paragraph 3 of the Complaint.

4. Lilly's medicines are approved by FDA as safe and effective for use only in specific conditions, including dose strengths, route of administration, packaging, and labeling—all of

which are essential components of what makes them genuine MOUNJARO® or ZEPBOUND®. But PWL's practices knowingly and directly destroy those characteristics, making its products—directly contrary to its advertising claims—dangerous, not FDA approved, and, in short, not the same as Lilly's medicines that bear its MOUNJARO® and ZEPBOUND® trademarks. Far from approving PWL's practices, both FDA and the CDC have specifically warned against dose splitting. As FDA has explained "[t]he moment a sterile container is opened and manipulated, a quality standard (sterility) is destroyed and previous studies supporting the standard(s) are compromised and are no longer valid."[1]

**ANSWER:** Defendants state that the FDA website referenced in Footnote 1 speaks for itself. Defendants deny the allegations specifically against them in Paragraph 4 of the Complaint. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 4 of the Complaint.

5. Lilly goes to great lengths to ensure the sterility of its authentic, FDA-approved medicines, which is crucially important because these medicines are injected directly into patients' bodies. Cracking open Lilly's single-use auto-injector pens or vials to create multiple doses—as PWL does—destroys sterility and introduces serious risk to patients who use the unsterile product. The moment the sterile container is opened, it becomes a potential breeding ground for bacteria. No anti-microbial preservatives. No safeguards. No regulatory oversight. A single tiny, invisible dose of infection can lead to sepsis, abscesses, or even death. None of this is hyperbole. There are

---

[1] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-446100-regulatory-action- regarding-approved-new-drugs-and-antibiotic-drug-products-subjected#:~:text=The%20FDA%20has%20an%20even,410.100); *see also* https://www.cdc.gov/injection- safety/hcp/clinical-safety/index.html.

countless examples of companies causing patients serious harm and even death by engaging in the same or similar practices as PWL.

**ANSWER:** Defendants deny the allegations specifically against them in Paragraph 5 of the Complaint. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 5 of the Complaint.

6. PWL nevertheless offloads this risk onto its patients for one reason and one reason only: profits. For each package of Lilly auto-injector pens it breaks apart into its altered drugs, PWL stands to gain upwards of $1,000 a month in profits—at the cost of patient health and safety.

**ANSWER:** Defendants deny the allegations in Paragraph 6 of the Complaint.

7. PWL engages in this dangerous and deceptive scheme while masquerading as a paragon of safety. It advertises its altered drugs under Lilly's trademarks knowing that it has altered the packaging and dose, thereby introducing significant patient safety risks of which the patient is not informed. In fact, PWL relies on patients not knowing there is a significant difference between Lilly's MOUNJARO® and ZEPBOUND® in their sterile, original, FDA-approved packaging and PWL's altered, unsterile, risky products. Lilly therefore brings this action to protect the public from PWL's dangerous, deceptive, and unlawful practices.

**ANSWER:** Defendants deny the allegations in Paragraph 7 of the Complaint.

8. PWL's trademark infringement and false advertising have the tendency to deceive the public and lure individuals with serious health conditions away from safe and effective, non-adulterated FDA-approved medicines in favor of unlawfully altered drugs bearing the Lilly Marks. Thus, Lilly files this Complaint for trademark infringement, false designation of origin, unfair competition, and false advertising pursuant to the Lanham Act, 15 U.S.C. §§ 1114 *et seq*, and trademark infringement in violation of Indiana common law.

**ANSWER:** Defendants state that Plaintiff's Complaint speaks for itself. Defendants deny the remaining allegations in Paragraph 8 of the Complaint.

## THE PARTIES

9. Plaintiff Lilly is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

**ANSWER:** Defendants admit the allegations in Paragraph 9 of the Complaint.

10. Defendant Premier Weight Loss of Indiana, LLC is a limited liability company organized under the laws of Indiana, doing business under the assumed name Premier Weight Loss, with its principal place of business located at 15757 Oak Road, Carmel, IN, 46033. Its registered agent is Thomas Hilbert with a registered agent address at 8902 N Meridian St, 100, Indianapolis, IN, 46260.

**ANSWER:** Defendants deny that Premier Weight Loss of Indiana, LLC has its principal place of business located at 15757 Oak Road, Carmel, IN, 46033. Defendants admit the remaining allegations in Paragraph 10 of the Complaint.

11. Defendant Premier Weight Loss Management, LLC is a limited liability company organized under the laws of Indiana, with its principal place of business located at 15757 Oak Road, Carmel, IN, 46033. Its registered agent is Thomas Hilbert with a registered agent address at 15757 Oak Road, Carmel, IN, 46033.

**ANSWER:** Defendants deny that Premier Weight Loss Management, LLC has its principal place of business located at 15757 Oak Road, Carmel, IN, 46033 and further deny that its registered agent's address is 15757 Oak Road, Carmel, IN 46033. Defendants admit the remaining allegations in Paragraph 11 of the Complaint.

<u>**JURISDICTION AND VENUE**</u>

12. The Court has subject matter jurisdiction over the Lanham Act causes of action pleaded in this case pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a). This Court has subject matter jurisdiction over the common law cause of action pursuant to 28 U.S.C. §1367(a).

**ANSWER:** Defendants admit the allegations in Paragraph 12 of the Complaint.

13. Premier Weight Loss of Indiana, LLC is subject to personal jurisdiction in this District because it is registered in Indiana and operates its principal place of business in this District. Indeed, its registered address corresponds with one of the two addresses provided on PWL's website listing its clinic locations, along with 10475 Crosspoint Boulevard Suite 315, Indianapolis, IN 46256.[2]



**ANSWER:** Defendants state that the Premier Weight Loss website speaks for itself. Defendants lack sufficient knowledge or information regarding what Plaintiff means by "registered address," and therefore, cannot admit or deny that part of Paragraph 13 of the Complaint. Defendants admit Premier Weight Loss of Indiana, LLC's principal place of business is 8902 N. Meridian St., Ste. 100, Indianapolis, IN 46260. Defendants admit the remaining allegations in Paragraph 13 of the Complaint.

---

[2] https://pwlindy.com/

14. Premier Weight Loss Management, LLC is subject to personal jurisdiction in this District because it is registered in Indiana and operates its principal place of business in this District.

**ANSWER:** Defendants admit the allegations in Paragraph 14 of the Complaint.

15. Venue is proper in this District and division pursuant to 28 U.S.C. § 1391(b)(1) because both PWL entities are organized in and have their principal places of business in this District and Division.

**ANSWER:** Defendants admit the allegations in Paragraph 15 of the Complaint.

## FACTUAL ALLEGATIONS

### I. Lilly's FDA-Approved Tirzepatide Medicines

### A. Lilly's History of Producing Safe and Effective Medicines

16. Lilly is an international medicine company and pharmaceutical manufacturer. Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries. Today, Lilly's medicines help tens of millions of patients across the globe, including in Indiana.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 16 of the Complaint.

17. Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet its rigorous quality and safety standards. Transforming active pharmaceutical ingredients, or API, into medicine is a complex, methodical, and science-based process. Lilly follows current Good Manufacturing Practices ("cGMP") across the design, monitoring, and control of manufacturing processes and facilities—from establishing robust quality management systems to obtaining quality raw materials and detecting and investigating product quality deviations. Each step—from

chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing and controls and specialized equipment.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 17 of the Complaint.

18. Lilly develops and manufactures its medicines in compliance with FDA oversight, the international gold standard for pharmaceuticals that includes rigorous pre-approval testing for safety and effectiveness under specified conditions of use, routine FDA inspections of manufacturing facilities, adverse event reporting obligations, and post-market surveillance and studies. Additionally, Lilly's medicines must be, and always are, accompanied by important labels, instructions, and warnings that are approved by FDA as necessary components of the final product.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 18 of the Complaint.

**B. MOUNJARO® and ZEPBOUND®**

19. Lilly's proprietary MOUNJARO® and ZEPBOUND® are two first-of-their-kind medicines indicated for serious conditions afflicting millions of Americans. Approximately one in ten Americans have type 2 diabetes, and four in ten Americans are obese. To advance the treatment of these chronic conditions, Lilly used its extensive experience and years of research to develop its MOUNJARO® and ZEPBOUND® medicines, which were approved by FDA for sale to the public in 2022 and 2023, respectively. Today, Lilly promotes, offers, and sells MOUNJARO® and ZEPBOUND® throughout Indiana and the United States, among other places.

**ANSWER:** Defendants admit that MOUNJARO® and ZEPBOUND® are FDA-approved medications, which Plaintiff promotes, offers and sells. Defendant lack sufficient

knowledge or information to admit or deny the remaining allegations in Paragraph 19 of the Complaint.

20. Both MOUNJARO® and ZEPBOUND® contain the active pharmaceutical ingredient tirzepatide, which targets patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors. Tirzepatide activates both receptors to improve blood sugar control and reduce appetite and food intake.[3]

**ANSWER:** Defendants admit MOUNJARO® and ZEPBOUND® contain tirzepatide. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 20 of the Complaint.

21. Specifically, MOUNJARO® is designed to improve glycemic control in adults with type 2 diabetes mellitus (in addition to diet and exercise). As FDA has noted, "[d]espite the availability of many medications to treat diabetes, many patients do not achieve the recommended blood sugar goals."[4] MOUNJARO® targets this problem head-on. When used as directed, MOUNJARO® has been clinically proven to improve blood sugar control more effectively than other diabetes therapies.

**ANSWER:** Defendants state that the webpages referenced in Footnotes 3 and 4 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 21 of the Complaint.

---

[3] https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-announcements/fda-approves-novel-dual-targeted-treatment-type-2-diabetes (archived FDA MOUNJARO® approval press announcement); https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic- weight-management (FDA ZEPBOUND® approval press announcement).

[4] https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-announcements/fda- approves-novel-dual-targeted-treatment-type-2-diabetes (archived FDA MOUNJARO® approval press announcement).

22. ZEPBOUND® is designed to help the millions of American adults with obesity or who are overweight with weight-related medical problems. As FDA has noted, ZEPBOUND® "addresses an unmet medical need" by targeting "chronic weight management (weight reduction and maintenance)" through a new method of hormone receptor activation.[5] Accordingly, FDA originally indicated ZEPBOUND® for weight management for adults with obesity or those who are overweight and also have at least one additional weight-related condition, such as hypertension (high blood pressure), dyslipidemia (high cholesterol or fats in blood), type 2 diabetes mellitus, or cardiovascular disease. In December 2024, because of Lilly's ongoing post-approval research, FDA approved a second indication for ZEPBOUND® for the treatment of obstructive sleep apnea for adults with obesity.

**ANSWER:** Defendants state that the webpage referenced in Footnote 5 speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 22 of the Complaint.

23. Lilly exclusively owns the intellectual property rights related to MOUNJARO® and ZEPBOUND® and is the only lawful supplier of those medicines.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 23 of the Complaint.

**C.     The FDA Approval Process**

24. FDA approved MOUNJARO® and ZEPBOUND® pursuant to Lilly's marketing application, itself the culmination of a lengthy clinical trial process designed to develop, study, and bring safe medicines to patients so that—in FDA's words—"American consumers benefit

---

[5] https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic-weight- management (FDA ZEPBOUND® approval press announcement).

from having access to the safest and most advanced pharmaceutical system in the world."[6] Over the course of nearly a decade, Lilly completed thirty-seven pre-clinical studies and clinical trials for these medicines.

**ANSWER:** Defendants state that the webpage referenced in Footnote 6 speaks for itself. Defendants admit that MOUNJARO® and ZEPBOUND® are FDA-approved medications. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 24 of the Complaint.

25. MOUNJARO® and ZEPBOUND® are the only FDA-approved medicines containing tirzepatide in the United States.

**ANSWER:** Defendants admit or the allegations in Paragraph 25 of the Complaint.

26. FDA has recently confirmed in court that Lilly is the only lawful producer of tirzepatide in the United States.[7]

**ANSWER:** Defendants state that the case citation and webpage referenced in Footnote 7 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 26 of the Complaint.

27. MOUNJARO® and ZEPBOUND® are approved by FDA only in specific dosages and concentrations, and only for subcutaneous injection, and cannot be lawfully sold in other formulations or methods of administration. Indeed, as part of FDA's New Drug Application ("NDA") or Abbreviated New Drug Application ("ANDA") process, the Applicant must disclose to the Center for Drug Evaluation and Research ("CDER") detailed technical specifications on the

---

[6] https://www.fda.gov/drugs/development-approval-process-drugs (FDA explainer of new drug development process).

[7] *Outsourcing Facilities Assoc. v. FDA, et al.*, Case No. 4:24-cv-00953-P (N.D. Texas), Dkt. 83, at 1; https://www.law360.com/commercialcontracts/articles/2301352?utm_source=shared-articles&utm_medium=email&utm_campaign=shared-articles (media coverage of same).

drug substance and final pharmaceutical product.[8] Separately, CDER "approve[s] a container closure system to be used in the packaging of a human drug or biologics,"[9] based on a detailed description of the container closure system identifying all sources and components, information on the suitability of the container closure system for the drug product, details on the applicant's or fabricator's quality control program, and stability data for the drug product in the selected container closure system.[10] Making changes to a drug product or container closure system after FDA approval requires a detailed "assessment of the effects of a change on the identity, strength, quality, purity, and potency of the drug product"[11] compared to quality standard specifications, as well as additional testing to assess "changes in the chemical, physical, microbiological, biological, bioavailability, and/or stability profiles."[12]

**ANSWER:** Defendants state that the webpages referenced in Footnotes 8-12 speak for themselves. Defendants admit that MOUNJARO® and ZEPBOUND® are FDA-approved medications. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 27 of the Complaint.

28. The only FDA-approved formulations for MOUNJARO® and ZEPBOUND® are 2.5mg/0.5mL, 5mg/0.5mL, 7.5mg/0.5mL, 10mg/0.5mL, 12.5mg/0.5mL, and 15mg/0.5mL per week, with each injection consisting of 0.5mL of solution regardless of the concentration of drug prescribed.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 28 of the Complaint.

---

[8] https://www.fda.gov/drugs/types-applications/new-drug-application-nda
[9] FDA, *Guidance for Industry: Container Closure Systems for Packaging Human Drug and Biologics*, at 8 (May 1999), https://www.fda.gov/media/70788/download.
[10] *Id.* at 17–20.
[11] https://www.fda.gov/media/71846/download, at 4–5.
[12] *Id.* at 5.

29.     The only FDA-approved presentations for MOUNJARO® and ZEPBOUND® are Lilly's auto-injector pens (for all dose formulations) and factory-sealed single-dose vials (for ZEPBOUND® dose formulations up to 10mg/0.5mL).

**ANSWER:**     Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 29 of the Complaint.

30.     Accompanying Lilly's auto-injector pens or factory-sealed single-dose vials is the FDA-approved "label" and "Patient Package Insert" for MOUNJARO® or ZEPBOUND®. The label is a detailed description of indications and uses, dosage and administration, warnings and precautions designed to advise clinicians prescribing these medications. The label also contains summaries of the clinical pharmacology, toxicology, and clinical trial results for the medicine, as well as instructions for safe handling.[13] The Patient Package Insert contains three sections: the medication guide, instructions for use, and a quick reference guide. These documents are designed to educate patients about the medication they have been prescribed, what to expect while taking the medication, and how to administer the medication safely and effectively.[14]

**ANSWER:**     Defendants state that the webpages referenced in Footnotes 13 and 14, the label and the Patient Package Insert speak for themselves.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 30 of the Complaint.

**D.     Lilly's Clinical Trials**

31.     Before a new medication can be brought to market, it must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and

---

[13]    For the current FDA-approved label, see https://pi.lilly.com/us/mounjaro-uspi.pdf (for Mounjaro) and https://pi.lilly.com/us/zepbound-uspi.pdf (for Zepbound).

[14]    https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/215866s000lbl.pdf (FDA-approved Label with accompanying Package Inserts for Mounjaro)

effective for people to use.[15] These clinical trials are also used to study different uses for already approved medications that could identify new indications, increase effectiveness, make the medication easier to use, or decrease side-effects.[16]

**ANSWER:** Defendants state that the webpages referenced in Footnotes 15 and 16 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 31 of the Complaint.

32. Lilly has submitted to FDA thirty-seven preclinical and clinical studies of its MOUNJARO® and ZEPBOUND®, which evaluate the safety and efficacy of its tirzepatide medicines for its intended uses. These trials were conducted over the course of multiple years and at great expense to Lilly.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 32 of the Complaint.

33. Lilly's trials provided it with the necessary data to demonstrate that its MOUNJARO® and ZEPBOUND® medicines are safe and effective for people to use. Without the trials, these medicines would not be eligible for FDA approval and the substantial time, labor, and capital expended by Lilly to conduct them was therefore necessary to bring these medicines to market and promote them for public use.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 33 of the Complaint.

---

[15] https://www.fda.gov/patients/drug-development-process/step-3-clinical-research#The_Investigational_New_Drug_Process (FDA explainer on clinical trial steps for new drug development).

[16] https://www.fda.gov/patients/clinical-trials-what-patients-need-know/basics-about-clinical-trials (FDA explainer of basics about clinical trials).

**II. LILLY'S MOUNJARO® AND ZEPBOUND® TRADEMARKS**

34. Lilly uses the trademarks MOUNJARO® and ZEPBOUND® to identify and promote Lilly's proprietary, FDA-approved medicines with the active pharmaceutical ingredient tirzepatide. Lilly markets and sells MOUNJARO® and ZEPBOUND® throughout the United States, including in Indiana, using the Lilly Marks.

**ANSWER:** Defendants admit that Plaintiff uses trademarks MOUNJARO® and ZEPBOUND®. Defendants further admit that MOUNJARO® and ZEPBOUND® contain tirzepatide and Plaintiff markets and sells the medications. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 34 of the Complaint.

35. Lilly first adopted and used the MOUNJARO® mark at least as early as June 3, 2022, and has used the MOUNJARO® mark continuously since that time. Lilly has extensively promoted, advertised, and marketed its prescription-only diabetes medicine bearing the MOUNJARO® mark in many different channels, directed both to healthcare professionals and to patients.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 35 of the Complaint.

36. Lilly is the owner of two federal trademark registrations for MOUNJARO®, U.S. Reg. Nos. 6,809,369 (issued August 2, 2022) and 7,068,463 (issued May 30, 2023). True and correct copies of Lilly's registrations for the MOUNJARO® mark are attached hereto as part of **Exhibit A.** Lilly additionally has several pending applications to register its MOUNJARO® mark in connection with more classes, services, and goods, including U.S. Trademark Ser. Nos. 97/596,856, 97/668,206, and 98/253,743. As a result of its use of the MOUNJARO® mark, Lilly also owns valuable common law and other rights in and to the MOUNJARO® mark.

**ANSWER:** Defendants state that Exhibit A speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 36 of the Complaint.

37. Lilly first adopted and used the ZEPBOUND® mark at least as early as November 30, 2023, and has used the ZEPBOUND® mark continuously since that time. Lilly has extensively promoted, advertised, and marketed its prescription-only weight management and obstructive sleep apnea medicine bearing the ZEPBOUND® mark in many different channels, directed both to healthcare professionals and to patients.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 37 of the Complaint.

38. Lilly is the owner of one federal trademark registration for ZEPBOUND®, U.S. Reg. No. 7,288,373 (issued January 23, 2024). A true and correct copy of Lilly's registration for the ZEPBOUND® mark is attached hereto as part of **Exhibit A.** Lilly additionally has several pending applications to register its ZEPBOUND® mark, including U.S. Trademark Ser. Nos. 97/530,451, 97/530,456, and 98/295,137. As a result of its use of the ZEPBOUND® mark, Lilly also owns valuable common law and other rights in and to the ZEPBOUND® mark.

**ANSWER:** Defendants state that Exhibit A speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 38 of the Complaint.

39. Lilly conceived the Lilly Marks to stand out in the marketplace. The Lilly Marks do not describe any attributes of either medicine and accordingly are inherently distinctive.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 39 of the Complaint.

40.     Lilly promotes, advertises, and markets MOUNJARO® and ZEPBOUND® through various channels, including on the websites mounjaro.com, mounjaro.lilly.com, zepbound.com, and zepbound.lilly.com, in social media, in online advertisements, and on television.

**ANSWER:**     Defendants state that Plaintiff's websites, social media, online advertisements and television advertisements speak for themselves.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 40 of the Complaint.

41.     As a result of Lilly's use, promotion, advertising, and marketing of MOUNJARO® and ZEPBOUND®, the Lilly Marks are exclusively associated with Lilly, serve to identify genuine Lilly products, and are valuable assets of Lilly.

**ANSWER:**     Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 41 of the Complaint.

## III.     PWL's Altered Drugs[17]

### A.     PWL's Altered Outer Packaging and Insert

42.     PWL's altered drugs purport to be Lilly medicines but are not offered in the Lilly packaging: they do not come in the box containing the FDA-approved language, nor is the drug product itself in the factory-sealed auto-injector pen depicted below, in which unaltered MOUNJARO® medicine is exclusively distributed, and in which ZEPBOUND® doses of

---

[17]     Unless otherwise stated, all allegations in Sections III, IV, and V are made subject to Lilly's information and belief.

2.5mg/0.5mL, 5mg/0.5mL, 7.5mg/0.5mL, 10mg/0.5 mL, 12.5mg/0.5mL, and 15mg/0.5mL are distributed.[18]



**ANSWER:** Defendants admit that Lilly only distributes MOUNJARO® medicine in auto-injector pens. Defendants further admit that Lilly states on its website that ZEPBOUND® doses of 2.5mg, 5mg, 7.5mg, 10mg, 12.5mg, and 15mg are available. Defendants state that the webpage referenced in Footnote 18 speaks for itself. Defendants lack sufficient knowledge or information to admit or deny Plaintiff's blanket assertion in Footnote 17. Defendants deny the remaining allegations in Paragraph 42 of the Amended Complaint.

43. ZEPBOUND® doses of 2.5mg/0.5mL, 5mg/0.5mL, 7.5mg/0.5mL, and 10mg/0.5mL are also available in a single-dose vial format shown below.[19]

---

18 Mounjaro warnings and instructions for use, available at https://uspl.lilly.com/mounjaro/mounjaro.html#ug0; Zepbound warnings and instructions for use, available at https://uspl.lilly.com/zepbound/zepbound.html#ug0.

19 https://investor.lilly.com/news-releases/news-release-details/lilly-releases-zepboundr-tirzepatide-single-dose- vials-expanding.



**ANSWER:** Defendants admit that ZEPBOUND® is available in single-dose vials in addition to the auto-injector pens and Lilly states on its website that ZEPBOUND® vial doses of 2.5mg, 5mg, 7.5mg and 10mg are available. Defendants lack sufficient knowledge or information to admit or deny any remaining allegations in Paragraph 43 of the Complaint.

44. MOUNJARO® is not sold or distributed in any vial format in any dose or concentration. Likewise, MOUNJARO® is not sold or distributed in pre-filled syringes in any dose or concentration.

**ANSWER:** Defendants deny the allegations in Paragraph 44 of the Complaint.

45. ZEPBOUND® is not sold or distributed in a multi-dose vial format in any dose or concentration. Likewise, ZEPBOUND® is not sold or distributed in pre-filled syringes in any dose or concentration.

**ANSWER:** Defendants admit that Lilly only sells and distributes ZEPBOUND® in auto-injector pens and a single-dose vial format. Defendants deny any remaining allegations in Paragraph 45 of the Complaint.

46. Genuine, unaltered, FDA-approved Lilly auto-injector pens are distributed in a pack of four, corresponding to a month's worth of weekly administrations of Lilly's medicine. The

four pens are contained in a box whose external packaging contains additional warnings and instructions for storage that have separately been reviewed and approved by FDA, as well as batch identifiers and expiration dates required by FDA.



**ANSWER:** Defendants admit that Mounjaro® and Zepbound® auto-injector pens are available in a box of four pens. Defendants further admit that the boxes contain warnings, storage instructions, batch/lot numbers, and expiration dates. Defendants lack sufficient knowledge or information to admit or deny any remaining allegations in Paragraph 46 of the Complaint.

47. Each individual auto-injector pen or vial of genuine, unaltered Lilly medicine is labeled with a batch number, as is the external packaging. This batch number ensures that Lilly can trace its medicines and ensure the safety and quality of its medicines as they enter the market.

**ANSWER:** Defendants admit that Mounjaro® and Zepbound® auto-injector pens and their external packaging contain batch numbers for tracing the medicines. Defendants lack sufficient knowledge or information to admit or deny any remaining allegations in Paragraph 47 of the Complaint.

48. Unlike Lilly's medicines, PWL's altered drugs are distributed in clear plastic bags affixed with PWL's prescribing information and bearing the Lilly Marks, with the drug itself contained in nondescript third-party insulin syringes.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 48 of the Complaint.

49. PWL sells its altered drugs without the FDA-required documentation that accompanies MOUNJARO® and ZEPBOUND®.

**ANSWER:** Defendants denies the allegations in Paragraph 49 of the Complaint.

50. FDA requires a Patient Package Insert to be placed in each box of medicine—a patient-centric version of the FDA-approved prescription drug label that includes details on the active and inactive ingredients, method of administration, side effects, storage, and general safety information about the medicine.[20] PWL's removal of the Patient Package Insert prevents consumers from obtaining critical and material information. From a safety perspective, it no longer contains instructions for safe storage and administration. Likewise, it no longer contains the batch information, expiration dates, and other quality assurance markers. If the patient suffers an adverse event from taking this medication, there is no instruction to contact their physician and Lilly.

**ANSWER:** Defendants state that the webpage referenced in Footnote 20 speak for itself. Defendants deny the allegations specifically against them in Paragraph 50 of the Complaint.

---

[20] https://www.fda.gov/drugs/fdas-labeling-resources-human-prescription-drugs/patient-labeling-resources#inserts

Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 50 of the Complaint.

51.     The removal of the Patient Package Insert also aids in PWL's deception. First, it prevents patients from comparing the unboxed third-party syringes they receive from PWL to the images of properly sterile, packaged Lilly auto-injector pens or single-dose vials. Second, it prevents patients from seeing that—for patients receiving single-dose vials—Lilly does *not* provide needles and syringes. Third, it prevents them from seeing that Lilly's medicines are all approved to be administered in 0.5mL doses.[21]



**Guide to parts**

**Note:** The needle and syringe are not included. The needle and syringe recommended by your healthcare provider may look different than the needle and syringe in this Instructions for Use.

| Step 7: | |
|---------|---|
| Hold the syringe in one hand with the needle pointing up. With the other hand pull down on the plunger until the plunger tip reaches the line on the syringe indicating that 0.5 mL of air has been drawn into the syringe. | |

---

[21]   https://pi.lilly.com/us/zepbound-vial-us-ifu.pdf

| | |
|---|---|
| **Step 10:**<br><br>Turn the vial and syringe upside down. Make sure that the tip of the needle is in the liquid and slowly pull the plunger down until the plunger tip is past the 0.5 mL line.<br><br>If there are air bubbles, tap the syringe gently a few times to let any air bubbles rise to the top. | |
| **Step 11:**<br><br>Slowly push the plunger up until the plunger tip reaches the 0.5 mL line. | |

**ANSWER:** Defendants state that the webpage referenced in Footnote 20 speak for itself. Defendants deny the remaining allegations in Paragraph 51 of the Complaint.

52. Instead, PWL includes its own single-page label and PWL-branded package insert containing directions for use, which have not been reviewed or approved by FDA and are not nearly as comprehensive as the actual approved disclosures. For example, in the PWL label's "HOW TO USE" section, it instructs patients to "[r]ead the Medication Guide and Instructions for Use provided by your pharmacists before you start using tirzepatide," but does not include either document which are part of the FDA-approved Patient Package Insert.

**ANSWER:** Defendants admit that a Premier Weight Loss label and package insert with directions for use are provided to their patients. Defendants further admit their labeling and package inserts have not been approved by the FDA. Defendants state that their labeling speaks for itself. Defendants deny any remaining allegations in Paragraph 52 of the Complaint.

**B. PWL's Tampering and Re-dosing**

    *1. PWL's altered drugs are obviously altered because they contain less volume than unaltered Lilly medicines*

53.     All dosages of MOUNJARO® and ZEPBOUND® are formulated at a dose-per-milliliter ratio per 0.5mL. Additionally, all Lilly auto-injector pens or single-use vials contain 0.5mL of liquid, regardless of the concentration of active to inactive ingredients. Accordingly, the strength of each MOUNJARO® and ZEPBOUND® dose represents the concentration of tirzepatide in that 0.5mL, not the total volume.[22]



INSTRUCTIONS FOR USE
MOUNJARO® (mown-JAHR-OH)
(tirzepatide)
injection, for subcutaneous use

2.5 mg/0.5 mL single-dose pen
5 mg/0.5 mL single-dose pen
7.5 mg/0.5 mL single-dose pen
10 mg/0.5 mL single-dose pen
12.5 mg/0.5 mL single-dose pen
15 mg/0.5 mL single-dose pen
use 1 time each week

**ANSWER:**     Defendants state that the webpages referenced in Footnote 22 speak for itself.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 48 of the Complaint.

54.     By contrast, PWL offers 2.5mg doses of "Mounjaro" and "Zepbound" in third-party insulin syringes containing approximately 0.1mL of liquid, one fifth of what would be contained in a MOUNJARO® or ZEPBOUND® 2.5mg auto-injector pen or in a ZEPBOUND® 2.5mg single- dose vial.

**ANSWER:**     Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 54 of the Complaint.

---

[22]     *Id.*; *see also* https://zepbound.lilly.com/sleep-apnea/how-to-use

55. PWL's patients, however, are unaware that the amount of liquid in each dose they receive indicates that PWL is providing altered drugs, because PWL has replaced the documentation that would provide this information.

**ANSWER:** Defendants deny the allegations in Paragraph 55 of the Complaint.

2. *The concentration of PWL's altered drugs likewise indicate that they have been altered and are not intended for use in the prescribed doses*

56. To achieve PWL's desired dose for its altered drugs, PWL purchases Lilly medicines and breaks open the individual sterile auto-injector pens and re-distributes fractions of the liquid contents into third-party insulin syringes.

**ANSWER:** Defendants admit they purchase Plaintiff's medicines and sometimes repackage Plaintiff's medicines into third-party insulin syringes. Defendants deny the remaining allegations in Paragraph 56 of the Complaint.

57. The prescription label accompanying PWL's altered drugs lists the *concentration* of drug as that of a single 12.5mg dose of MOUNJARO®—12.5mg/0.5mL—but lists the amount of liquid in a 4-pack of syringes as 0.4mL cumulatively. Necessarily, therefore, PWL constructs its purported weekly 2.5mg dose by splitting the contents of a single 12.5mg MOUNJARO® auto-injector pen into five individual syringes that are then distributed to one or more customers.

**ANSWER:** Defendants lack sufficient knowledge or information regarding what prescription label is being referenced in Paragraph 57 of the Complaint. Therefore, Defendants deny the allegations in Paragraph 57 of the Complaint.

58. Likewise, the prescription label accompanying PWL's altered drugs lists the *concentration* of drug as that of a single 15mg dose of ZEPBOUND®—15mg/0.5mL—but lists the amount of liquid in a 3-pack of syringes as 0.33mL cumulatively. According to the amount of liquid and dose strength listed, PWL constructs its purported weekly 2.5mg dose by splitting the

contents of a 15mg ZEPBOUND® auto-injector pen into five individual syringes that are then distributed to one or more customers.

**ANSWER:** Defendants lack sufficient knowledge or information regarding what prescription label is being referenced in Paragraph 58 of the Complaint. Therefore, Defendants deny the allegations in Paragraph 58 of the Complaint.

59. As with the volume of liquid in the syringes, someone with knowledge about Lilly's medicines—or the disclosures accompanying Lilly's FDA-approved product—would understand that receiving a 2.5mg dose of either "Mounjaro" or "Zepbound" at a listed concentration of 12.5mg/0.5mL or 15/mg/0.5mL should raise red flags that the medicines have been altered. PWL has, however, replaced the documents and packaging containing that information with their own packaging and package insert, preventing consumers from realizing the concentration indicates the medicines have been altered.

**ANSWER:** Defendants deny the allegations in Paragraph 59 of the Complaint.

3. *PWL's cracking and re-packing endangers patients*

60. Critically, both MOUNJARO® and ZEPBOUND® are intended for use—and only approved—as sterile injectables. But PWL's decision to break open Lilly's FDA-approved medicines in their FDA-approved packaging destroys that sterility.

**ANSWER:** Defendants deny the allegations specifically against them in Paragraph 60 of the Complaint. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 60 of the Complaint.

61. Further, PWL does not use sterile repackaging techniques or follow cGMP to preserve sterility and instead puts its altered doses into non-sterile third-party insulin syringes, at

least some of which are then misleadingly—and, dangerously, if mistakenly taken at its word—labeled "insulin" on the syringe itself.

**ANSWER:** Defendants deny the allegations in Paragraph 61 of the Complaint.

62. Additionally, PWL misrepresents the doses on its labels. A concentration of 15mg per 0.5mL means that there is 3mg of tirzepatide per 0.1mL. According to PWL's listed volume and dose strength, what PWL markets as "2.5mg Zepbound" actually contains 3.3mg of tirzepatide.

**ANSWER:** Defendants deny the allegations in Paragraph 62 of the Complaint.

63. Lilly does not sell tirzepatide in 3.3 mg doses, nor has it been approved by FDA in this dose.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 63 of the Complaint.

64. Not only are PWL's doses not as advertised, they are also untested and unproven for either safety or effectiveness.

**ANSWER:** Defendants deny the allegations in Paragraph 64 of the Complaint.

65. Because these doses are untested and unproven—and because PWL does not run any of its own clinical testing or research on its altered drug products—PWL has no clinical data showing that the unapproved doses are effective.

**ANSWER:** Defendants deny the allegations in Paragraph 65 of the Complaint.

66. The untested, unproven, altered products are particularly dangerous for patients with type 2 diabetes. PWL's package insert states: "Zepbound & Mounjaro are the same medication. There is literally no difference besides the label/name." Such a patient seeking unaltered Lilly medicines who was prescribed and purchased PWL's altered products received

improper doses, which could have significant consequences, including a failure to achieve glycemic control from PWL's altered drugs.

**ANSWER:** Defendants state the package insert speaks for itself. Defendants deny the remaining allegations in Paragraph 66 of the Complaint.

67. Finally, PWL's practice of opening and repackaging Lilly's medicines is additionally problematic because PWL subdivides high-concentration doses into *five* syringes, while only distributing *three* or *four* syringes in a monthly dose. PWL thus distributes medicine from a single Lilly auto-injector pen to multiple patients or, more problematically, medicine from multiple batches of Lilly auto-injector pens to a single patient. In the event of a serious adverse event, PWL's tampering makes it impossible to trace the original source of the Lilly medicine that PWL manipulated.

**ANSWER:** Defendants deny the allegations in Paragraph 67 of the Complaint.

68. The manipulations made to PWL's altered drugs were made by PWL or at PWL's direction.

**ANSWER:** Defendants deny the allegations in Paragraph 68 of the Complaint.

69. Because PWL materially altered Lilly's authorized and approved medicines after they left Lilly's custody, Lilly has no control over the safety, quality, or effectiveness of the altered drugs sold by PWL.

**ANSWER:** Defendants deny the allegations in Paragraph 69 of the Complaint.

70. PWL's marketing materials do not disclose this repackaging, leaving most consumers instead believing that the altered drugs they receive from PWL are Lilly's unaltered MOUNJARO® and ZEPBOUND® medicines under Lilly's quality and safety controls. They are not.

**ANSWER:** Defendants deny the allegations in Paragraph 70 of the Complaint.

**C.      The Dangers of Unapproved and Untested Drugs**

71.      The rapid rise of unapproved and untested drugs into the marketplace—including those purporting to contain tirzepatide—poses serious public health risks. Both compounded drugs and adulterated branded medicines (like PWL's altered drugs) are prime examples of the unapproved and untested drugs that are flooding the market for weight-loss medications.

**ANSWER:** Defendants deny the allegations specifically against them in Paragraph 71 of the Complaint.  Defendants admit that drugs containing compounded substitutes can pose health risks.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 71 of the Complaint.

*1.      The risks of compounded drugs*

72.      Compounding is a "practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[23]

**ANSWER:** Defendants state that the webpage referenced in Footnote 23 speaks for itself.  Defendants deny any remaining allegations in Paragraph 72 of the Complaint.

73.      As FDA itself makes clear, "[c]ompounded drugs are not FDA-approved."[24] FDA does not review compounded drugs for safety, effectiveness, or quality before they reach patients.

---

[23]      https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding (FDA guidance on drug compounding law compliance).

[24]      https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers (FDA drug compounding FAQ).

**ANSWER:** Defendants state that the webpage referenced in Footnote 24 speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 73 of the Complaint.

74. For that reason, FDA has warned that "Compounded drugs … do not have the same safety, quality, and effectiveness assurances as approved drugs. Unnecessary use of compounded drugs unnecessarily exposes patients to potentially serious health risks." [25]

**ANSWER:** Defendants state that the webpage referenced in Footnote 25 speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 74 of the Complaint.

75. There are countless examples of people experiencing serious injury from taking unregulated drugs. Inappropriate drug compounding resulted in at least 73 reported compounding errors between 2001 and 2019. These errors led to more than 1,562 adverse events and at least 116 deaths.[26]

**ANSWER:** Defendants state that the webpage referenced in Footnote 26 speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 75 of the Complaint.

76. As compounding of tirzepatide has become more prevalent, government agencies have warned the public as to the risks of such products. For instance, in July 2024, FDA sent a letter to compounding advocacy organizations warning that it has received "reports describing patients who experienced adverse events following the administration of compounded

---

[25] https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers (FDA drug compounding FAQ).

[26] https://www.justice.gov/usao-ma/pr/former-owner-defunct-new-england-compounding-center-resentenced-14- years-prison. (DOJ press release on compounder prison sentence).

… tirzepatide."[27] FDA reiterated that "compounded drug products, including compounded … tirzepatide products, are not FDA-approved. They do not undergo premarket review by FDA for safety, effectiveness, or quality."[28] Further, an October 2024 FDA statement warned of "multiple reports of adverse events, some requiring hospitalization, that may be related to dosing errors."[29]

**ANSWER:** Defendants state that the webpages referenced in Footnotes 27-29 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 76 of the Complaint.

77. Leading organizations have also expressed concern. 37 State Attorneys General and State Drug Task Forces have all warned the public about the dangers of these unsafe and unapproved products, including compounders using "non-sterile ingredients" and taking "no steps to sterilize them."[30] The Obesity Society, Obesity Action Coalition, and Obesity Medicine issued a joint statement regarding compounded GLP-1 medications, stating, "[u]nfortunately, many of the available alternatives [to GLP-1 therapies], like compounded versions of semaglutide and tirzepatide, are not what they are advertised to be."[31] The Pediatric Endocrine Society has also advised that "[c]linicians and patients [] should exercise caution when exploring options for non-

---

[27] https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf (July 16, 2024, FDA letter sent to the Alliance for Pharmacy Compounding and the Outsourcing Facility Association).

[28] *Id.*

[29] https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss (October 2, 2024 FDA statement on Unapproved GLP-1 Drugs).

[30] National Association of Attorneys General, "State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs," (February 19, 2025), https://www.naag.org/policy-letter/state-and-territory-attorneys-general-urge-fda-to-take-action-against-counterfeit-and-illegally-sold-glp-1-drugs/; NBC News, "Tennessee Woman Accused of Selling Fake Weight Loss Drugs as Counterfeit Concerns Grow," (December 17, 2024), https://www.nbcnews.com/health/health-news/tennessee-woman-accused-selling-fake- weight-loss-drugs-counterfeit-con-rcna184154.

[31] https://obesitymedicine.org/blog/leading-obesity-expert-organizations-release-statement-to-patients-on-glp-1- compounded-alternatives/ (Joint Statement On Compounded GLP-1 Alternatives).

brand name medications, particularly avoiding the use of non-FDA approved medications and those that come from non-FDA-approved compounding pharmacies."[32] Similarly, the JAMA Health Forum published a study that most websites selling compounded anti-obesity medications exclude important safety information and mislead consumers about the safety and effectiveness of their products.[33] Other patient and consumer groups have issued similar warnings, including the National Consumers League and the American Diabetes Association, which recommended that patients avoid compounded products "due to uncertainty about their content, safety, quality, and effectiveness."[34] Australia recently banned the development and sale of compounded anti-obesity medications due to "increasing community concern" and "increasing reports of patients coming to harm from " compounded weight loss drugs.[35] The ban—effective October 2024—targets compounded drugs that are "being misrepresented and sold as replica [] Mounjaro®."[36] As Mark Butler, Australia's Minister for Health, said, "Australians should be able to have faith in the medications they use, including compounded medicines," and the ban "will protect Australians

[32] Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024), https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and- other-glp-1-receptor-agonists/ (last accessed Mar. 11, 2025).

[33] Ashwin Chetty et al., *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists*, JAMA Health Forum (Jan 17, 2025), available at https://jamanetwork.com/journals/jama-health- forum/fullarticle/2829225 (last accessed Mar. 20, 2025).

[34] National Consumers League, *NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs* (Feb. 4, 2025), https://nclnet.org/the-national-consumers-league-urges-the-public-to-heed- warnings-about-unregulated-versions-of-glp-1-weight-loss-drugs/ (last accessed Mar. 20, 2025); American Diabetes Ass'n, *The American Diabetes Association Announces Statement on Compounded Incretin Products* (Dec. 2, 2024), https://diabetes.org/newsroom/press-releases/american-diabetes-association-announces-statement-compounded-incretin#:~:text=The%20statement%20recommends%20against%20using,safety%2C%20quality%2C%20and%20effectiveness (last accessed Mar. 20, 2025).

[35] Department of Health and Aged Care, *Protecting Australians form unsafe compounding of replica weight loss products* (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting- australians-from-unsafe-compounding-of-replica-weight-loss-products (last accessed Mar. 20, 2025).

[36] *Id.*

from harm and save lives."[37] Likewise, the South African government has proposed to prohibit the development of compounded GLP-1s. South Africa's regulatory authority has "noted with concern the number of compounded, substandard, and/or falsified versions" of tirzepatide products being sold to the public since "[t]he complexity of compounding GLP1 agonists, which are sterile medicines containing complex active substances[,] poses a public health and safety risk."[38]

**ANSWER:**    Defendants state that the webpages and articles referenced in Footnotes 30-38 speak for themselves.  Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 77 of the Complaint.

78.    PWL (correctly) recognizes the risks presented to patients by unapproved, compounded products, including by asserting on its website that compounded tirzepatide drugs are "NOT safe."[39] But instead of taking steps to ensure it uses only unaltered, sterile, and approved Lilly medicines, PWL exploits the real risks of compounding to sell another risky, altered product that is not FDA approved or guaranteed by Lilly's quality controls.

**ANSWER:**    Defendants state that their website referenced in Footnote 39 and Paragraph 78 of the Complaint speaks for itself.  Defendants deny the remaining allegations in Paragraph 78 of the Complaint.

---

[37]    *Id.*
[38]    South African Health Products Regulatory Authority, *SAHPRA's Position on GLP1 and GIP-GLP1 Products That Are Compounded, Substandard And Falsified* (Nov. 8, 2024), https://www.sahpra.org.za/news-and- updates/sahpras-position-on-glp1-and-gip-glp1-products-that-are-compounded-substandard-and-falsifiedas/ (last accessed Mar. 20, 2025).
[39]    https://pwlindy.com/faq/

2. *The risks of altered drugs*

79. Despite PWL's efforts to distinguish itself from the risks of compounded products, drugs sold as brand-name medications by resellers who have altered the genuine medication prior to resale also pose serious public health risks.

**ANSWER:** Defendants deny the allegations specifically against them in Paragraph 79 of the Complaint. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 79 of the Complaint.

80. For instance, FDA has long expressed "great[] concern about the manipulation of approved sterile drug products," because "[t]he moment a sterile container is opened and manipulated, a quality standard (sterility) is destroyed and previous studies supporting the standard(s) are compromised and are no longer valid."[40] The CDC warns to "not save leftover medication from [single-dose] vials"—like those used for Zepbound—because single-dose vials lack antimicrobial preservatives found in multi-dose vials.[41]

**ANSWER:** Defendants state that the webpages and articles referenced in Footnotes 40 and 42 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 80 of the Complaint.

81. These risks are not just theoretical. For example, in 2021, a compounding pharmacist pled guilty to providing adulterated drugs to cataract surgery patients. At least 100 patients were injected with the adulterated compounds, at two different surgery centers, over a period of months. 43 of those patients were left blinded or had their vision impaired.[42] One patient

---

[40] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-446100-regulatory-action- regarding-approved-new-drugs-and-antibiotic-drug-products-subjected#:~:text=The%20FDA%20has%20an%20even,410.100)

[41] https://www.cdc.gov/injection-safety/media/pdfs/Injection-Safety-For-Healthcare-P.pdf

[42] https://www.reuters.com/legal/government/pharmacist-pleads-guilty-adulterating-drug-linked-eye-injuries-2021- 10-13/

had believed "every pill you take, every shot you take is tested" and was surprised to learn that the drug he received was neither fully tested nor deemed safe or otherwise approved by FDA.[43]

**ANSWER:** Defendants state that the webpages and articles referenced in Footnotes 42 and 43 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 81 of the Complaint.

82. Consequences from altered drugs may be deadly. In 2012, drugs manufactured without FDA oversight and contaminated with a fungus were shipped throughout the country and later injected into patients' spines and joints. These contaminated products led to more than 750 cases of fungal infections and caused the deaths of more than 100 people from fungal meningitis.[44] Company executives were convicted and received sentences of up to 14.5 years in prison.

**ANSWER:** Defendants state that the webpage referenced in Footnote 44 speaks for itself. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 82 of the Complaint

83. As these examples demonstrate, the risks of altered drugs are particularly acute in the context of unsterile manufacturing or unsterile repackaging of sterile injectables. For instance, in 2013, 15 patients were infected with bacteria from compounded calcium gluconate injections.[45] In 2017, 43 patients experienced vision loss, macular swelling, and/or retinal degeneration from compounded intravitreal injections.[46] And in 2022, FDA issued a warning letter to North American Custom Laboratories, LLC d/b/a FarmaKeio Superior Custom Compounding for "serious

---

[43] https://www.wfaa.com/article/news/do-not-publish-yet/287-5f002ed3-e110-4063-9959-a2e5f54b5097 (WFAA article re outbreak).

[44] https://www.justice.gov/usao-ma/pr/former-owner-defunct-new-england-compounding-center-resentenced-14-years-prison. (DOJ press release on compounder prison sentence).

[45] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001–19* (Mar. 2020), https://tinyurl.com/4rswtudf

[46] *Id*.

deficiencies in your practices for producing drug products intended or expected to be sterile, which put patients at risk."[47] As a result of these findings, FDA also recommended a voluntary recall of all of FarmaKeio's unexpired drug products that are intended to be sterile.[48]

**ANSWER:** Defendants state that the webpages and articles referenced in Footnotes 45-47 speak for themselves. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 83 of the Complaint.

## IV. PWL's Trademark Infringement and False Advertising

84. PWL does not sell Lilly's factory-sealed, FDA-approved MOUNJARO® and ZEPBOUND®. Rather, PWL sells altered drugs that have been manipulated in a way that negates Lilly's rigorous safety and quality assurances and FDA approval that resulted from them.

**ANSWER:** Defendants deny the allegations in Paragraph 84 of the Complaint.

85. Lilly does not sell MOUNJARO® or ZEPBOUND® to PWL for resale or redistribution. Nor has Lilly authorized PWL to use the Lilly Marks in connection with any of PWL's offered goods or services.

**ANSWER:** Defendants admit that Lilly does not sell directly to them. Defendants lack sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 85 of the Complaint.

---

[47] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/north-american-custom-laboratories-llc-dba-farmakeio-superior-custom-compounding-642792-11182022#:~:text=WARNING%20LETTER,-Dear%20Mr.&text=During%20the%20inspection%2C%20the%20investigator,firm%20on%20March%2010%2C% 202022. (FDA Warning Letter to FarmaKeio).
[48] https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use- sterile-products-north-american-custom (FDA notice of voluntary recall).

86. Instead, PWL buys MOUNJARO® and ZEPBOUND® in a higher dosage strength (*e.g.*, 12.5mg/0.5mL or 15mg/0.5mL), breaks open the auto-injector pens, and divides the contents of what was intended as a single administration into five lower-dose, non-sterile administrations. It then omits the labeling and package inserts that accompany Lilly's FDA-approved medicines and transmits its own less informative and unapproved information to the patient.

**ANSWER:** Defendants deny the allegations in Paragraph 86 of the Complaint.

87. When questioned about the source of PWL's altered drugs, PWL's healthcare providers perpetuate this deceit during conversations with patients. For instance, in response to patient questions about the source of PWL's altered drugs, PWL's providers have claimed that it purchases high-dose vials of Lilly's medicines in "bulk" and transfers the medicine into syringes to make the doses easier for patients to self-administer.

**ANSWER:** Defendants deny the allegations in Paragraph 87 of the Complaint.

88. Yet PWL's website, blog, social media, and print advertising convey the unmistakable impression that PWL is offering Lilly's factory-sealed, FDA-approved MOUNJARO® and ZEPBOUND® for sale. In fact, PWL makes no mention in any of its advertising that it has removed, re-dosed, and repacked Lilly's medicines, or caused them to be re-dosed and repackaged. PWL does not communicate the risks associated with its altered drugs—instead, it actively and deceptively downplays those risks, including in conversations with patients where PWL's doctors have communicated its altered drugs come from high-dose vials of Lilly's genuine medicines that are purchased in "bulk" and transferred to syringes for ease of self-administration.

**ANSWER:** Defendants state that PWL's website, blog, social media, and print advertising speak for themselves. Defendants deny the remaining allegations in paragraph 88 of the Complaint.

89. PWL is therefore engaged in an illicit scheme to deceive customers by using the Lilly Marks along with false assurances that it offers "the real deal," "brand name," and "authentic" Lilly medicines to divert individuals seeking Lilly medicines to PWL's altered drugs, which have been tampered with in a manger that negates Lilly's safety and quality control standards and the FDA approval for the brand-name medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 89 of the Complaint.

**A. PWL's Unauthorized Use of the Lilly Marks**

90. Through its advertising—including statements on its website, posts on its blog and on social media accounts controlled by PWL, and through printed advertising distributed to prospective patients—PWL leverages the Lilly Marks to sell its altered drugs to an unsuspecting public.

**ANSWER:** Defendants deny the allegations in Paragraph 90 of the Complaint.

91. A compilation of examples of PWL's trademark infringement is discussed below and attached hereto as Exhibit B.

**ANSWER:** Defendants state that Exhibit B speaks for itself. Defendants deny the remaining allegations in Paragraph 91 of the Complaint.

92. PWL's blatant and unauthorized use of the Lilly Marks can be seen the second a customer visits the homepage of PWL's website, which contains a promotional video that refers to PWL's altered drugs as "Mounjaro" and "Zepbound."[49]

---

[49] https://pwlindy.com/.





**ANSWER:** Defendants state that the webpage referenced in Footnote 49 and Paragraph 92 of the Complaint speaks for itself. Defendants deny the remaining allegations in Paragraph 92 of the Complaint.

93.     PWL's website further contains a webpage solely dedicated to MOUNJARO®. On that page, PWL includes the trademark registration symbol in connection with its use of the Lilly Mark.[50]

**ANSWER:**     Defendants state that the webpage referenced in Footnote 50 and Paragraph 93 of the Complaint speaks for itself.  Defendants deny any remaining allegations in Paragraph 93 of the Complaint.

94.     Similarly, PWL's website contains a webpage dedicated to ZEPBOUND®, on which it presents the brand name with the trademark registration symbol affixed.[51]

---

[50]   https://pwlindy.com/weight-loss-medication/mounjaro/.
[51]   https://pwlindy.com/weight-loss-medication/zepbound/.

**ANSWER:** Defendants state that the webpage referenced in Footnote 51 and Paragraph 94 of the Complaint speaks for itself. Defendants deny any remaining allegations in Paragraph 94 of the Complaint.

95. PWL's unauthorized use of the Lilly Marks extends to its blog, on which PWL continues to refer to its altered drugs as "FDA approved, brand name GLP-1 injections like Mounjaro [and] Zepbound."[52]

---

[52] https://pwlindy.com/weight-loss-injections-and-pcos-what-you-need-to-know/.

**ANSWER:** Defendants state that the webpage referenced in Footnote 52 and Paragraph 95 of the Complaint speaks for itself. Defendants deny any remaining allegations in Paragraph 95 of the Complaint.

96. PWL's unauthorized use of the Lilly Marks continues on its social media accounts, which contain posts that refer to PWL's altered drugs using the hashtag "#Mounjaro," use the Lilly Marks to promote that it "offer[s] the real, FDA approved medications ( … Eli Lilly's Zepbound)."[53]



[53]

https://www.instagram.com/p/CvtGRvptkx3/?utm_source=ig_web_copy_link&igsh=MzRlODBiNW FlZA==; https://www.instagram.com/reel/C_ldgykvr6k/?utm_source=ig_web_copy_link; https://www.instagram.com/reel/C_tRI2JPcV2/?utm_source=ig_web_copy_link&igsh=MzRlODBiN WFlZA==.





**ANSWER:** Defendants state that the webpages referenced in Footnote 53 and Paragraph 96 of the Complaint speaks for itself. Defendants deny any remaining allegations in Paragraph 96 of the Complaint.

97. PWL's unauthorized use of the Lilly Marks is not limited to its internet advertising. Indeed, PWL also distributes printed marketing materials that use the Lilly Marks to emphasize the alleged branded nature of its altered drugs using all-caps, and that acknowledge that

"MOUNJARO® and ZEPBOUND® are registered trademarks of Eli Lilly, which [is] not affiliated with or [a] sponsor[] of Premier Weight Loss."



**ANSWER:** Defendants state that their printed material speak for themselves. Defendants deny any remaining allegations in Paragraph 97 of the Complaint.

98. PWL's serial and prominent use of the Lilly Marks first started long after Lilly had adopted them. PWL's use of the Lilly Marks can therefore only have been intended to gain a competitive advantage from the goodwill Lilly has generated around the Lilly Marks.

**ANSWER:** Defendants deny the allegations in Paragraph 98 of the Complaint.

99. For instance, PWL emphasizes the safety concerns associated with compounded tirzepatide in its FAQ section, criticizing the "minimal oversight of the production and import of these [compounded] meds" and stating that PWL "do[es] not recommend injecting ANY medication whose source of production and safety cannot be verified."



54

**ANSWER:** Defendants state that their website referenced in Footnote 54 and Paragraph 99 of the Complaint speaks for itself. Defendants deny the remaining allegations in Paragraph 99 of the Complaint.

100. By contrast, PWL specifically touts the safety of "Branded Medications like … Mounjaro® and Zepbound[.]®"[55]

---

54 https://pwlindy.com/faq/.

55 https://www.instagram.com/p/DAGpsF2OMy9/?utm_source=ig_web_copy_link&igsh=MzRlODBiN WFlZA==.



**ANSWER:** Defendants state that the webpage referenced in Footnote 55 and Paragraph 100 of the Complaint speaks for itself. Defendants deny the remaining allegations in Paragraph 100 of the Complaint.

101. PWL uses the Lilly Marks in advertising and promotion on its website, blog, and social media to promote its products as "real" to confuse patients who are seeking to be prescribed and purchase genuine, unaltered, factory-sealed MOUNJARO® or ZEPBOUND® to treat their serious health conditions. But instead, PWL gives them altered products in such a manner as to obscure from the patients that they have not received the true Lilly medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 101 of the Complaint.

102. PWL's prominent and improper use of the Lilly Marks is likely to cause consumers to falsely believe that they were prescribed and are purchasing actual, factory-sealed MOUNJARO® or ZEPBOUND®, that PWL is a source for Lilly's FDA-approved treatment options MOUNJARO® or ZEPBOUND®, that the safety of PWL's altered drugs is dictated by Lilly's quality and safety controls, or that PWL's services or the altered drugs are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

**ANSWER:** Defendants deny the allegations in Paragraph 102 of the Complaint.

103. PWL's use of the Lilly Marks is without the permission, consent, or authorization of Lilly. PWL has no right to use, and PWL knows that it has no right to use, the Lilly Marks in connection with its altered drugs.

**ANSWER:** Defendants deny the allegations in Paragraph 103 of the Complaint.

104. In making such unauthorized use of the Lilly Marks, PWL seeks to—and does—freeride on Lilly's reputation and goodwill that it has achieved through the development and promotion of its medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 104 of the Complaint.

105. By touting its products as MOUNJARO® and ZEPBOUND®, PWL confuses customers into believing that the safety and effectiveness profile of PWL's altered drugs are the same as that of unaltered MOUNJARO® and ZEPBOUND® medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 105 of the Complaint.

106. PWL's unauthorized use of the Lilly Marks is intended—and likely—to cause confusion, to cause mistake, or to deceive, and infringes Lilly's established exclusive rights in the Lilly Marks.

**ANSWER:** Defendants deny the allegations in Paragraph 105 of the Complaint.

107. PWL's infringement allows it to unjustly profit from sales of altered drugs to patients looking for MOUNJARO® and ZEPBOUND®.

**ANSWER:** Defendants deny the allegations in Paragraph 105 of the Complaint.

108. Unless enjoined by this Court, PWL will continue to use the Lilly Marks in connection with its altered drugs, leading consumers to believe they are receiving FDA-approved, unaltered MOUNJARO® and ZEPBOUND®, all in violation of Lilly's rights.

**ANSWER:** Defendants deny the allegations in Paragraph 105 of the Complaint.

### B. PWL's False Advertising

109. PWL falsely promotes its goods and services by emphasizing that it offers "Brand Name GLP-1 weight loss injections[.]"[56]



**ANSWER:** Defendants deny the allegations in Paragraph 109 of the Complaint.

110. For example—and as depicted in Paragraph 92 above—a promotional video on PWL's website claims that it offers "brand name medications like Mounjaro … and Zepbound" to its patients. These statements necessarily and deceptively communicate that the products PWL provides are genuine, unaltered MOUNJARO® and ZEPBOUND®, which is false.

**ANSWER:** Defendants state that their website referenced in Footnote 58 and Paragraph 110 of the Complaint speaks for itself. Defendants deny the remaining allegations in Paragraph 110 of the Complaint.

111. Likewise—as depicted in Paragraph 96 above—posts advertising its altered drugs on social media state that PWL "offer[s] the real, FDA approved medications ( … Eli Lilly's

---

[56]  https://pwlindy.com/.

Zepbound).” Again, these statements necessarily and deceptively communicate that the product PWL provides is genuine, unaltered MOUNJARO® and ZEPBOUND®, which is false.

**ANSWER:** Defendants state that the webpage referenced in Paragraphs 96 and 111 of the Complaint speaks for itself. Defendants deny the remaining allegations in Paragraph 111 of the Complaint.

112. PWL’s printed materials fare no better. As depicted in Paragraph 97 above, PWL’s pamphlet emphasizes that it sells “BRANDED medication” while listing the per-month cost for 2.5 mg of “Mounjaro” or “Zepbound” at $375. But as demonstrated above in Section III, PWL’s 2.5 mg syringes of “Mounjaro” and “Zepbound” are not true, FDA-approved Lilly medicines, but rather the contents of Lilly’s medicines removed, re-dosed, and re-sealed in new packaging without appropriate warnings or required labeling. Indeed, even when PWL tells consumers they are receiving 2.5 mg doses of Zepbound, in reality it gives them 3.3 mg dosages, an unapproved and untested dosage.

**ANSWER:** Defendants state that their printed materials speak for themselves. Defendants deny the remaining allegations in Paragraph 112 of the Complaint.

113. Notably, PWL engages in this false and deceptive advertising of its altered drugs while simultaneously warning of the dangers of compounded GLP-1 products and touting Lilly’s safety standards. These statements are designed to exploit the justifiable fears of prospective patients who are seeking to be prescribed and purchase genuine, unaltered Lilly medicines, and PWL profits from those patients’ concerns while simultaneously deceiving them.

**ANSWER:** Defendants deny the allegations in Paragraph 113 of the Complaint.

114. PWL is well aware of the safety concerns associated with drugs manufactured or altered outside of Lilly’s oversight. On its Instagram page, PWL warns consumers that “[i]t is not

a guarantee that compounded GLP-1 medications will be as safe and effective as the name brand GLP-1 medications! At Premier Weight Loss, we only have the name brand, FDA approved weight loss injections!"[57]



**ANSWER:** Defendants state that the webpage referenced in Footnote 57 and Paragraph 114 of the Complaint speaks for itself. Defendants deny the remaining allegations in paragraph 114 of the Complaint.

115. PWL further attempts to differentiate itself from clinics that source drugs from compounding pharmacies, falsely promoting that "[w]e only prescribe brand name, authentic medications" and "do not use any compounded or 'generic' substitutes because we prioritize your safety above all else!"[58]

---

[57] https://www.instagram.com/p/DCCXFjoPvxp/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.

[58] https://www.instagram.com/reel/CyBzT8eOp4R/?utm_source=ig_web_copy_link&igsh=MzRlODBiNWFlZA==.



**ANSWER:** Defendants state that the webpage referenced in Footnote 58 and Paragraph 115 of the Complaint speaks for itself. Defendants deny the remaining allegations in paragraph 115 of the Complaint.

116. Through its advertising, PWL falsely and necessarily communicates that its altered drugs are genuine, unaltered Lilly medicines or, alternatively, that they are as safe and effective as genuine, unaltered Lilly medicines. PWL's actions thus cause confusion in the marketplace and deceive patients with serious health conditions regarding the authenticity, safety, and sterility of PWL's altered drugs.

**ANSWER:** Defendants deny the allegations in Paragraph 116 of the Complaint.

117. By touting its products as MOUNJARO® and ZEPBOUND®, PWL deceives consumers into believing that the risk and efficacy profile of PWL's altered drugs are the same as that of genuine, unaltered MOUNJARO® and ZEPBOUND® medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 117 of the Complaint.

118. PWL's false statements regarding the safety of their altered drugs are a driving force in consumers' purchasing decisions. PWL not only acknowledges this fact, it exploits it: its

marketing focuses on drawing a distinction between their products—which they claim are safe—and compounded tirzepatide—which they, rightly, inform patients is unsafe.

**ANSWER:** Defendants deny the allegations in Paragraph 118 of the Complaint.

119. Consumers are actually deceived by PWL's false statements. Moreover, PWL's false statements have a tendency to deceive its intended audience: patients seeking diabetes or weight loss medications but who have valid concerns about only taking safe, FDA-approved medications from manufacturers they trust and that are rigorously regulated by FDA.

**ANSWER:** Defendants deny the allegations in Paragraph 119 of the Complaint.

120. PWL's false statements allow it to unjustly profit from sales of altered drugs to patients looking for genuine, unaltered MOUNJARO® and ZEPBOUND® medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 120 of the Complaint.

121. Unless enjoined by this Court, PWL will continue to make false statements in connection with the marketing and sale of its altered drugs, leading consumers to believe they are receiving genuine, unaltered MOUNJARO® and ZEPBOUND® medicines, all in violation of Lilly's rights.

**ANSWER:** Defendants deny the allegations in Paragraph 121 of the Complaint.

## V. <u>HARM TO THE PEOPLE OF INDIANA AND LILLY</u>

122. Lilly's FDA-approved MOUNJARO® and ZEPBOUND® medicines have undergone extensive clinical trials and approval processes. But these clinical studies and FDA approvals only apply to unaltered MOUNJARO® and ZEPBOUND® medicines—which are factory-sealed, sterile, and properly packaged and labeled—when used as directed by a prescribing

physician. The clinical trials and approval processes do not ensure the safety, quality, or effectiveness of PWL's altered drugs.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 122 of the Complaint.

123. PWL's trademark infringement and false advertising may expose patients to the serious risks described above. Critically, because PWL uses the Lilly Marks in connection with its altered drugs, patients are unlikely to know that the drugs they receive from PWL have been tampered with and cannot be relied on to be sterile, nor the associated risks.

**ANSWER:** Defendants deny the allegations in Paragraph 123 of the Complaint.

124. Patients who take PWL's altered drugs and suffer harm will have had no forewarning.

**ANSWER:** Defendants deny the allegations in Paragraph 124 of the Complaint.

125. Not only does PWL's trademark infringement and false advertising expose the people of Indiana to serious health risks, but PWL's unlawful tactics undermine the name, goodwill, and reputation that Lilly has invested heavily in developing. Were a consumer to suffer an adverse event due to contaminants introduced by PWL's tampering, the consumer would likely be confused into errantly believing that the issue was the result of a problem with Lilly's safety controls.

**ANSWER:** Defendants deny the allegations in Paragraph 125 of the Complaint.

***

126. In short, throughout its advertising, PWL attempts to distinguish itself from competitors selling compounded tirzepatide on the basis that its brand-name offerings, namely MOUNJARO® and ZEPBOUND®, are "real, FDA approved" and safe and effective. But its

altered drugs are not FDA-approved, and the safety profile cannot be guaranteed when the product has been tampered with, as PWL has done. Instead, PWL sells unlawfully re-dosed and repackaged products to its consumers under Lilly's MOUNJARO® and ZEPBOUND® trademarks, leading consumers to believe any adverse effects caused by this unsafe and unlawful practice were caused by Lilly.

**ANSWER:** Defendants deny the allegations in Paragraph 126 of the Complaint.

127. PWL's false advertising and trademark infringement is likely to—and does—confuse and deceive consumers to believe they are receiving unaltered, factory-sealed MOUNJARO® and ZEPBOUND® when instead they receive a clear plastic bag of non-sterile syringes containing an altered substance, the original safety and quality assurances of which PWL intentionally destroyed.

**ANSWER:** Defendants deny the allegations in Paragraph 127 of the Complaint.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**in Violation of 15 U.S.C. § 1114**

128. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

**ANSWER:** Defendants PWL incorporate by reference their responses in the preceding paragraphs.

129. Lilly is the owner of all right, title, and interest in federal trademark registrations for the inherently distinctive Lilly Marks and has standing to maintain an action for trademark infringement under 15 U.S.C. § 1114.

**ANSWER:** Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 129 of the Complaint.

130. Without Lilly's consent, PWL has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of their altered drugs purporting to be unaltered MOUNJARO® and ZEPBOUND®. Consumers who encounter PWL's unauthorized use of the Lilly Marks in connection with PWL's altered drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

**ANSWER:** Defendants deny the allegations in Paragraph 130 of the Complaint.

131. PWL's actions are likely to cause confusion, or to cause mistake, or to deceive, and thus constitute trademark infringement of the registered Lilly Marks, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

**ANSWER:** Defendants deny the allegations in Paragraph 131 of the Complaint.

132. PWL had actual and/or constructive knowledge of Lilly's rights prior to their infringing use of the Lilly Marks. The actions of PWL alleged above have at all times relevant to this action been willful.

**ANSWER:** Defendants deny the allegations in Paragraph 132 of the Complaint.

133. As a direct and proximate result of the actions of PWL alleged above, Lilly has been damaged and will continue to be damaged. PWL's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill. This harm constitutes an injury for which Lilly has no adequate remedy at law.

**ANSWER:** Defendants deny the allegations in Paragraph 133 of the Complaint.

134. This is an exceptional case under 15 U.S.C. § 1117.

**ANSWER:** Defendants deny the allegations in Paragraph 134 of the Complaint.

135.     Based on such conduct, Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including PWL's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

**ANSWER:**  Defendants deny the allegations in Paragraph 135 of the Complaint.

**SECOND CAUSE OF ACTION**
**Trademark Infringement, False Designation of Origin**
**and Unfair Competition in Violation of 15 U.S.C. § 1125**

136.     Lilly repeats and realleges each and every allegation above as if fully set forth herein.

**ANSWER:**     Defendants PWL incorporate by reference their responses in the preceding paragraphs.

137.     Lilly is the owner of all right, title, and interest in the inherently distinctive Lilly Marks and has standing to maintain an action for trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. § 1125.

**ANSWER:**     Defendants lack sufficient knowledge or information to admit or deny the allegations in Paragraph 137 of the Complaint.

138.     Without Lilly's consent, PWL has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of their altered drugs purporting to be unaltered MOUNJARO® and ZEPBOUND® medicines. Consumers who encounter PWL's unauthorized use of the Lilly Marks in connection with PWL's altered drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

**ANSWER:**     Defendants deny the allegations in Paragraph 138 of the Complaint.

139. PWL's actions are likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of the products and services and commercial activities of PWL, and thus constitute trademark infringement, false designation of origin, and unfair competition with respect to the Lilly Marks, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

**ANSWER:** Defendants deny the allegations in Paragraph 139 of the Complaint.

140. PWL had actual and/or constructive knowledge of Lilly's rights prior to their infringing use of the Lilly Marks. The actions of PWL alleged above have at all times relevant to this action been willful.

**ANSWER:** Defendants deny the allegations in Paragraph 140 of the Complaint.

141. As a direct and proximate result of the actions of PWL alleged above, Lilly has been damaged and will continue to be damaged. PWL's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill. This harm constitutes an injury for which Lilly has no adequate remedy at law.

**ANSWER:** Defendants deny the allegations in Paragraph 141 of the Complaint.

142. This is an exceptional case under 15 U.S.C. § 1117.

**ANSWER:** Defendants deny the allegations in Paragraph 142 of the Complaint.

143. Based on such conduct, Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including PWL's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

**ANSWER:** Defendants deny the allegations in Paragraph 143 of the Complaint.

**THIRD CAUSE OF ACTION**
**False and Misleading Advertising and Promotion**
**in Violation of 15 U.S.C. § 1125**

144. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

**ANSWER:** Defendants PWL incorporate by reference their responses in the preceding paragraphs.

145. PWL's commercial advertising claims described herein are false and misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

**ANSWER:** Defendants deny the allegations in Paragraph 145 of the Complaint.

146. PWL has knowingly and willfully made materially false statements in its commercial advertisements for its altered drugs (including on its website and social media). These statements—including PWL's altered drugs being the "real stuff," "FDA approved, brand name GLP-1 injections like Mounjaro [and] Zepbound", "brand name, authentic medications," "BRANDED," medications, stating that "[i]t is not a guarantee that compounded GLP-1 medications will be as safe and effective as the name brand GLP-1 medications! At Premier Weight Loss, we only have the name brand, FDA approved weight loss injections!", and calling on patients to "Lose Weight Safely!" by using "Brand Name Only" products—have influenced and are likely to continue to influence consumers' purchasing decision, specifically the decision to purchase PWL's altered drugs instead of Lilly's FDA-approved medicines. As a result, PWL is steering individuals with serious diseases like diabetes and obesity away from obtaining safe, effective, available, and FDA-approved treatments. PWL's unlawful conduct is putting health, safety, and lives at risk.

**ANSWER:** Defendants deny the allegations in Paragraph 146 of the Complaint.

147. PWL has caused its false and deceptive statements to enter interstate trade or commerce.

**ANSWER:** Defendants deny the allegations in Paragraph 147 of the Complaint.

148. As a direct and proximate result of PWL's false and deceptive campaign, Lilly is suffering immediate and continuing, competitive irreparable injury for which there is no adequate remedy at law.

**ANSWER:** Defendants deny the allegations in Paragraph 148 of the Complaint.

149. As a direct and proximate result of PWL's false and deceptive campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the loss of goodwill.

**ANSWER:** Defendants deny the allegations in Paragraph 149 of the Complaint.

150. This is an exceptional case under 15 U.S.C. § 1117.

**ANSWER:** Defendants deny the allegations in Paragraph 150 of the Complaint.

151. Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including PWL's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

**ANSWER:** Defendants deny the allegations in Paragraph 151 of the Complaint.

<u>**FOURTH CAUSE OF ACTION**</u>
**Trademark Infringement in Violation of Indiana Common Law**

152. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

**ANSWER:** Defendants PWL incorporate by reference their responses in the preceding paragraphs.

153. The above-described acts of PWL constitute trademark infringement in violation of Indiana common law.

**ANSWER:** Defendants deny the allegations in Paragraph 153 of the Complaint.

154. Without Lilly's consent, PWL has used and continues to use in commerce the Lilly Marks to pass off its altered drugs as unaltered MOUNJARO® and ZEPBOUND® medicines.

**ANSWER:** Defendants deny the allegations in Paragraph 154 of the Complaint.

155. PWL's unauthorized use of the Lilly Marks in connection with PWL's altered drugs and related goods and services is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of the products and services and commercial activities of PWL.

**ANSWER:** Defendants deny the allegations in Paragraph 155 of the Complaint.

156. Consumers who encounter PWL's unauthorized use of the Lilly Marks in connection with PWL's altered drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

**ANSWER:** Defendants deny the allegations in Paragraph 156 of the Complaint.

157. PWL's actions thereby unfairly and wrongfully exploit and infringe Lilly's trademark, goodwill, and reputation.

**ANSWER:** Defendants deny the allegations in Paragraph 157 of the Complaint.

158. As a direct and proximate result of PWL's unfair methods of competition, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Lilly to PWL and by a loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® medicines and the Lilly Marks.

**ANSWER:** Defendants deny the allegations in Paragraph 158 of the Complaint.

159. By reason of PWL's acts, Lilly's remedy at law is not adequate to compensate for the injuries inflicted by PWL. Accordingly, Lilly is entitled to entry of preliminary and permanent injunctive relief.

**ANSWER:** Defendants deny the allegations in Paragraph 159 of the Complaint.

### AFFIRMATIVE DEFENSES

Defendants, Premier Weight Loss of Indiana, LLC d/b/a Premier Weight Loss, and Premier Weight Loss Management, LLC, respectfully for their Affirmative Defenses to Plaintiff's Complaint state the following:

1. Plaintiff fails to state a claim upon which relief can be granted.

2. Any damages sustained by Plaintiff were caused in whole or in part by non-parties.

3. Any damages sustained by Plaintiff were caused in whole or in part by their own actions or inactions.

4. Plaintiff's claims are barred in whole or in part by the failure to plead with the requisite specificity.

5. Plaintiff's claims are barred by the doctrine of unclean hands.

6. Plaintiff's claims are barred in whole or in part because Plaintiff failed to mitigate its damages.

7. Plaintiff's claims are barred in whole or in part by the doctrine of laches.

8. Plaintiff's claims are barred in whole or in part by its own acquiescence.

9. Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

10. Any use of Plaintiff's trademarks is permitted under the Lanham Act.

11. After conducting discovery, Defendants reserve the right to assert additional affirmative defenses.

WHEREFORE, Defendants, Premier Weight Loss of Indiana, LLC d/b/a Premier Weight Loss, and Premier Weight Loss Management, LLC, by counsel, respectfully request that the Court enter an Order denying Plaintiff Eli Lilly and Company's prayer for relief, entering judgment against Plaintiff and in favor of Defendants, Premier Weight Loss of Indiana, LLC d/b/a Premier Weight Loss, and Premier Weight Loss Management, LLC on all claims, and granting Defendants all other proper relief.

Respectfully submitted,

**COHENMALAD, LLP**

*/s/ Michael W. McBride*
Irwin B. Levin, #8786-49
Michael W. McBride, #27954-49
Edward B. Mulligan V, #29400-53
Brett B. Thomas, #32781-49
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481 (phone)
(317) 636-2593 (fax)
Email:  ilevin@cohenmalad.com
         mmcbride@cohenmalad.com
         nmulligan@cohenmalad.com
         bthomas@cohenmalad.com

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 2, 2025, the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Nicholas B. Reuhs
Adam Arceneaux
Ice Miller LLP
One American Square, Suite 2900
Indianapolis, IN 46282
Nicholas.reuhs@icemiller.com
Adam.arceneaux@icemiller.com

Diana M. Watral
Robin McCue
Ryan Moorman
James R.P. Hileman
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
diana.watral@kirkland.com
james.hurst@kirkland.com
robin.mccue@kirkland.com
ryan.moorman@kirkland.com
jhileman@kirkland.com

Joshua L. Simmons
Jeanna Wacker
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
joshua.simmons@kirkland.com

*/s/ Michael W. McBride*
Irwin B. Levin, #8786-49
Michael W. McBride, #27954-49
Edward B. Mulligan V, #29400-53
Brett B. Thomas, #32781-49

**CohenMalad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
317-636-6481 Ph
317-636-2593 Fx